James A. Patten (ID # 1191)
Craig D. Martinson (ID # 953)
Juliane E. Lore (ID # 9786)
**PATTEN, PETERMAN, BEKKEDAHL & GREEN, P.L.L.C.**
2817 Second Ave. North, Suite 300
Billings, MT 59101
Telephone (406) 252-8500
Facsimile: (406) 294-9500
Email: japatten@ppbglaw.com
        cmartinson@ppbglaw.com
        jlore@ppbglaw.com
Attorneys for Black Bull Run Development LLC

Ross Richardson (I.D. 14 2057)
**HENNINGSEN, VUCUROVICH &**
  **RICHARDSON, PC**
116 W. Granite
Butte, MT 59701
Telephone: (406) 723-3219
Fax: (406) 723-9534
Email: rossrichardson@questoffice.net
Attorney for Black Bull Golf Club, Inc.

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

IN RE:

| | |
|---|---|
| BLACK BULL GOLF CLUB, INC., ) | Case No. 10-60537 |
| ) | |
| Debtor. ) | |
| ) | |
| IN RE ) | Case No. 10-60593 |
| ) | |
| BLACK BULL RUN DEVELOPMENT, LLC, ) | |
| ) | |
| Debtor. ) | |

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING (2) AUTHORIZING DEBTORS TO UTILIZE CASH COLLATERAL, (3) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS AND (4) SCHEDULING INTERIM AND FINAL HEARINGS**

1

The Debtors and Debtors- in-Possession in the above-captioned cases (collectively, the "Debtors") hereby move for entry of an interim order (the "Interim Order") and a final order (the "Final Order"), under §§ 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the United States Bankruptcy Court for the District of Montana (the "Local Rules"), (i) authorizing the Debtors to obtain post petition financing, (ii) authorizing the Debtors to utilize cash collateral, (iii) granting adequate protection to the Secured Creditors (as defined below), and (iv) scheduling a final hearing on this motion (the "Motion"). In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## I.     BACKGROUND

### A.     The Chapter 11 Filing

1.      On March 22, 2010 Black Bull Golf Club, Inc., and on March 26, 2010, (the "Petition Date") Black Bull Run Development LLC each commenced a case ("Chapter 11 Cases") by filing a petition for relief under Chapter 11 of the Title 11 of the United States Code, (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

2.      No creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

2

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

    4.     The statutory predicates for the relief requested herein are Bankruptcy Rule 1015 and Local Rule 1015-1.

**B.**     **Background and Current Business Operations.**

    5.     Black Bull Run Development LLC owns approximately 485 acres of real property in Gallatin County, Montana upon which it has constructed a golf course and club house and associated improvements, has preliminary and final plat approval for 378 residential units and associated improvements, has preliminary and final plat approval for 378 residential units and has constructed necessary infrastructure for the development including roads and utilities.  Black Bull Golf Club, Inc. is allowed use of the golf course and, under an agreement with Black Bull Run Development LLC, will be conveyed the real property which comprises the golf course once 85% of the club memberships have been sold.  Black Bull Run Development LLC owns the unsold golf club memberships, receives the proceeds from their sales and controls the management of Black Bull Golf Club, Inc.  Approximately 33% of the memberships have been sold.

    6.     The Debtors' business location is approximately 1.25 miles west of Bozeman, Montana.  The Tom Weiskoph golf course is fully constructed and operational and is the only combined golf course/residential development in Gallatin, County.

    7.     Pursuant to § 101 of the Bankruptcy Code, each of the Debtors is an affiliate of the other Debtor.

8.      Currently Black Bull Run Development LLC has no paid employees.  Black Bull Run Development LLC has approximately 230 lots listed for sale at prices ranging from $195,000 to $500,000.

9.      Black Bull Golf Club, Inc. operates an 18 hole golf course and a club house.  It currently has 6 paid employees but will increase its work force to between 35 to 38 as the golf season commences.

10.      On April 24, 2006, Black Bull Run Development LLC entered into a Loan Facility with LaJolla Bank FSB of San Diego, California (the "Senior Secured Loan").  LaJolla Bank has been put into receivership by the Office of the Thrift Supervision and its assets, including the Senior Secured Loan, have been sold or assigned to One West Bank of Los Angeles, California (the "Senior Secured Lender").

11.      As of the petition date, Black Bull Run Development LLC was indebted to the Senior Secured Lender under the Senior Secured Loan in the amount of $31,264,434.  In addition, Black Bull Run Development LLC owes Gallatin County $275,360 for 2008 and the first half of 2009 property taxes and Leachman Angus Ranch $2,400,000 on a purchase money mortgage loan.  In addition, eleven construction liens have been filed totaling $1,033,515.  The total debt secured by real estate owned by Black Bull Run Development LLC is $34,973,309.  Black Bull Golf Club, Inc. has not guaranteed and is not liable for this debt.

12.      In order to secure the Senior Secured Loan, Black Bull Run Development LLC granted the LaJolla Bank a security interest and mortgage interest in, and lien on certain of its assets (the "Senior Prepetition Lien") including all real estate, inventory, accounts, fixtures, equipment, contract rights, and general intangibles, among other things.

4

13.   On January 7, 2010, LaJolla Bank notified Black Bull Run Development LLC it was in default of the Senior Secured Loan and such debt was accelerated.

14.   Construction liens have been filed in connection with materials and services provided to the Black Bull Run Development LLC.  As of March 26, 2010, the following liens totaling approximately $1,033,515 had been asserted against the Debtor:

| Creditor | Alleged Construction Lien |
|---|---|
| Allied Engineering | $54,313 |
| Abor Medic | $ 9,300 |
| Cashman Nursery | $ 96,577 |
| Don Kirby Electric | $ 31,005 |
| Eichorn Construction | $ 65,105 |
| Express Employment | $  8,236 |
| Liberty Electric | $ 18,703 |
| Rasmussen Concrete | $  1,900 |
| Schlauch Bottcher Construction | $ 42,572 |
| Sime Construction | $587,819 |
| Trapper Creek | $117,985 |

(Senior Secured Lender and its successors, Leachman Angus Ranch and the construction liens are hereafter called "Prepetition Lienholders").

15.   In addition to the above listed secured debt aggregating approximately $34,973,309, as of March 26, 2010 the Black Bull Run Development LLC estimates that it may owe approximately: (a) $806,317 for ordinary course trade debt; and (b) an unliquidated amount

for contractual unsecured obligations, including, without limitation, payments owed under leases. These estimates do not include claims which are contingent, unmatured and/or disputed.

16.     Black Bull Golf Club Inc., in turn, was indebted, as of March 22, 2010 to Wells Fargo Leasing under capital and operating leases which were, as of that date, in default and accelerated, in the sum of $1,208,096.  The property leased is generally golf course maintenance equipment.  Black Bull Run Development LLC, and other individuals associated with the Debtors have guaranteed this debt.  In addition, as of March 22, 2010, Black Bull Golf Club Inc was indebted to trade creditors in the amount of $145,686.

17.     On December 2, 2008, LaJolla Bank commissioned an appraisal of its remaining collateral which placed a value on the real estate at $15,600,000 and on the furniture, fixtures and equipment at $400,000 for a total value of $16,000,000.

18.     The Debtors commenced these Chapter 11 cases in order to preserve and maximize their business as a going concern, for the benefit of all stakeholders, and arrange through a Chapter 11 Plan, for an orderly liquidation of all or substantially all of their assets as a going concern.

19.     With the credit facility requested in this motion, the Debtors seek to preserve the value of their assets for the benefit of their creditors and the parties in interest in this case.

20.     At this time, the Debtors have an immediate need to maintain the golf course which is essential to maintaining the going concern value.  Without golf course maintenance, the golf course will deteriorate resulting in a loss of a critical amenity to the residential development; there will be a loss of income stream from Black Bull Golf Club membership dues; and the lack of operating funds will result in a loss of electrical power, loss of all perishables in the

clubhouse, the alarm system will not function, rodents, insects and weeds will flourish, vegetation will die, and the golf course will lose substantial value and this loss of value of the golf course will increase the cost of restoring the golf course by any equity acquiring the Debtors' assets and will result in decreased value on sale. Therefore, the Debtors also have an immediate need for additional operating financing that can only be obtained through a secured debtor-in-possession financing facility (hereinafter the "DIP Facility"). The Debtors' use of the funds provided under the DIP Facility shall be limited to expenditures described in the terms and conditions of the Interim Order and the DIP Loan Term Sheet during the period commencing on the date of the Interim Order through and including the date of the Final Hearing, in such amounts as may be made available to the Debtors by DIP Lender in accordance with the Budget and the terms and conditions set forth in the DIP Loan Agreements and the Interim Order.

## II.  RELIEF REQUESTED

21.   The Debtors intend to finance the operations of their businesses during the Chapter 11 Cases by entering into a post petition debtor-in-possession credit facility with the DIP Lender. The Debtors intend to use the proceeds of the DIP Facility (a) to fund the costs and expenses of the Debtors in respect of the golf course and club house, (b) to fund their general corporate needs, including working capital needs; and (c) to pay fees and expenses related to the financing and these Chapter 11 cases, in accordance with the terms set forth in the DIP Term Sheet and in accordance with the DIP Budget.

22.     The Debtors have negotiated the specific terms of the proposed DIP Facility with the DIP Lender.

23.     Additionally, with this Motion, the Debtors request entry of an order scheduling, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, not earlier than 15 days from the date of this motion, a Final Hearing for this Court to consider entry of a final order authorizing such additional postpetition financing.

**DIP Facility**

24.     CIP BB Lending LLC or one of its affiliates, has offered to provide debtor-in-possession financing under the following general terms, which are described in greater detail in the attached DIP Loan Term Sheet.

    (a)     $2,600,000 with $340,000 made available upon the issuance of an interim order;

    (b)     Interest at 15%;

    (c)     1% loan commitment fee;

    (d)     Due in full by December 31, 2010;

    (e)     Compliance with the DIP budget; and

    (f)     Other usual and customary debtor-in-possession financing terms.

25.     The Debtors request approval of the DIP Facility, authorizing:

    (a)     the Debtors to obtain a superpriority postpetition term loan financing facility in an aggregate principal amount of $2,600,000 with $340,000 made available upon the issuance of an interim order on the terms set forth on the DIP Term Sheet secured by substantially all of the assets of the Debtors now owned or hereafter acquired including, but not limited to, inventory, accounts receivable, unsold golf club memberships, other rights to payment whether arising before or after the Petition Date, property, plants, equipment, general intangibles,

8

instruments, interests in leaseholds, real property, patents, copyrights, trademarks, trade names, other intellectual property and the proceeds of all the foregoing (but excluding claims and causes of action under §§ 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code (collectively, the "Avoidance Actions")) (collectively, the "Collateral") having the following priority:

(i)  pursuant to §364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases, over any and all administrative expenses whether heretofore or hereafter incurred, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the professional fees set out in the budget attached to the DIP Term Sheet (the "Carve-Out");

(ii)  pursuant to §364(c)(2) of the Bankruptcy Code, by perfected first priority security interests and liens, not subject to subordination in and on all Collateral that is not otherwise subject to a lien, subject to the Carve-Out;

(iii)  pursuant to § 364(d)(1) of the Bankruptcy Code, by perfected first priority, priming and senior security interests and liens on all of the Collateral, not subject to subordination or any other liens except for prepetition liens of Wells Fargo Leasing on the golf course equipment and Gallatin County.  All existing liens, rights and interests granted to or for the benefit of Senior Secured Lender under the Senior Secured Loan and other related documents, Leachman Angus Ranch under the purchase money mortgage loan and all construction liens shall be primed and made subject to and subordinate to the perfected first priority senior liens to be granted to the DIP Lender, subject to the Carve-Out; and

9

(iv)   pursuant to § 364(c)(3) of the Bankruptcy Code, by perfected second priority security interests and liens, not subject to subordination, upon all the golf course equipment Collateral that is subject to the prepetition third party liens of Wells Fargo Leasing, subject to the Carve-Out;

(b)   the scheduling, pursuant to Bankruptcy Rule 4001, of an interim hearing (the "Interim Hearing") on this Motion for this Court to consider entry of an interim order annexed to the Motion (the "Interim Order") (i) authorizing the Debtor, on an interim basis, to forthwith borrow up to the aggregate amount of $340,000 from the DIP Lender under the DIP Facility, (ii) granting the adequate protection hereinafter described; and

(c)   Scheduling a Final Hearing on this Motion, as requested below.

### III.  BASIS FOR RELIEF

**A.     The Debtors' Need For DIP Financing**

26.     As noted above, the Debtors face liquidity constraints.  The Debtors have exhausted their options for addressing their liquidity issues.  Thus, without the DIP Facility the Debtors do not have sufficient available sources of working capital and financing to operate their businesses during the Chapter 11 Cases.  The Debtors need approval of the DIP Facility to, among other things, satisfy their costs and expenses in connection with the golf course and club house and other routine operating expenses such as payroll, contractor costs, or other obligations. Without the proposed source of post petition financing, the Debtors will be forced to discontinue their operations and cease maintenance of the golf course.  The DIP Facility will avoid such a result and provide a basis upon which the Debtors can continue ordinary course operations pending a final hearing on this matter.

27.     Moreover, access to such additional financing will provide the Debtors' employees, contractors, homeowners, customers and vendors with the needed assurance that the Debtors will be able to continue conducting their businesses in the ordinary course without interruption pending a final hearing on this motion. In the absence of immediate approval of the DIP Facility, the Debtors will have no choice but to immediately discontinue operations, resulting in immediate and irreparable harm to the Debtors and their estates through physical damage and deterioration of the golf course.  For these reasons, the Debtors have an immediate need for adequate postpetition financing.

**B.      The Debtors' Search For DIP Financing**

28.     Prior to and following the Petition Date, the Debtors sought post petition financing proposals from several sources.  Indeed, the Debtors, contacted multiple parties, and received preliminary interest from three parties.  Ultimately, however, the Debtors were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under §§ 364(a) and 364(b) of the Bankruptcy Code, or secured credit pursuant to § 364(c) of the Bankruptcy Code on terms and conditions more favorable to the Debtors' estates than those offered by the DIP Lender.  In light of the Debtors' search, and given the current credit markets and the value of the Debtors' property, the Debtors do not believe that any lender would be willing to loan new money to the Debtors on terms more favorable to the Debtors than the terms of the DIP Facility.

29.     After considering the proposals submitted by prospective lenders and engaging in vigorous, arm's-length, and good-faith negotiations, the Debtors determined, in the exercise of their business judgment, that the financing offered by the DIP Lender is in the best interests of

11

the Debtors' estates. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

30.     The Debtors believe that the proposed adequate protection will be sufficient to protect the Prepetition Lienholders from any diminution in value of their interest in the Prepetition Collateral. The adequate protection terms are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

## IV.  TERMS OF THE DIP FACILITY

31.     The terms of the proposed DIP Facility and uses are more specifically set forth in the proposed Interim Order (and the DIP Term Sheet annexed thereto) attached hereto as Exhibit 1. The Debtors submit that the terms of the proposed order are reasonable for financing of this type. Certain key terms of the financing and the justifications therefor are mentioned below.

32.     The DIP Facility provides for "priming" liens. The Debtors are proposing to prime those liens of the Prepetition Lienholders. The Prepetition Lienholders have not consented to the priming. Wells Fargo Leasing and Gallatin County are not being primed by the DIP Facility. The Debtors are proposing to provide the Prepetition Lienholders adequate protection in the form of maintaining value of the golf course and a second lien on unsold golf club memberships valued at $2,600,000.

## V.  APPLICABLE AUTHORITY

33.     Sections 364(c) and (d) of the Bankruptcy Code provide:

(a) If the trustee is unable to obtain unsecured credit allowable under §

12

503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

    (i)   with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b) of this title;

    (ii)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (iii)   secured by a junior lien on property of the estate that is subject to a lien.

    (b)   The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

    (i)   the trustee is unable to obtain such credit otherwise; and

    (ii)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

    (c)   In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

34.   Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor-in-possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

13

Fed. R. Bankr. P. 4001(c)(2).  The Debtors are seeking approval of the DIP Facility to avoid

immediate and irreparable harm to the estate.  Without the relief requested, the Debtors will

suffer immediate and irreparable harm because the Debtors will not be able to fund payroll, will

no longer be able to operate in the ordinary course of business and will not be able to avoid

deterioration of the golf course, and will likely be forced to cease operations on a going concern

basis.  Accordingly, pursuant to Bankruptcy Rule 4001, the Court is authorized to grant the relief

requested herein.

### A.    The DIP Financings Should Be Approved

35.    The Debtors were unable to obtain adequate postpetition financing in the form of

unsecured credit or unsecured debt with an administrative priority on a consensual basis.  The

circumstances of these cases instead require the Debtors to obtain financing under § 364(c) and

(d) of the Bankruptcy Code.  Having determined that financing was available only under § 364(c)

and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility at arm's length and

pursuant to their business judgment, which is to be accorded deference so long as it does not run

afoul of the provisions of and policies underlying the Bankruptcy Code.  *See, e.g., Bray v.*

*Shenandoah Fed. Sav. & Loan Ass'n* (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986)

(approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames*

*Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("cases consistently reflect that the court's

discretion under § 364 is to be utilized on grounds that permit reasonable business judgment to

be exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit parties in interest").

14

36.     The proposed DIP Facility is required to preserve and maintain the Debtors' going concern value during these Chapter 11 Cases.  Therefore, the proposed DIP Facility is in the best interests of the Debtors' estates and creditors.  The availability of credit pursuant to the DIP Facility is necessary to provide working capital for the Debtors to continue to operate their businesses.  Moreover, the available credit will afford the Debtors' vendors, customers and contractors the necessary confidence to continue ongoing relationships with the Debtors, including the extension of credit terms for the payment of goods and services, and also will be viewed favorably by the Debtors' employees.

37.     Accordingly, the Debtors request that this Court authorize the Debtors to obtain the DIP Facility to the extent and pursuant to the terms set forth herein, in the Interim Order and the DIP Term Sheet and on such terms as shall be set forth in definitive debtor-in-possession loan documentation (the "DIP Financing Documents").

**B.     Approval of Priming Liens**

38.     If a debtor is unable to obtain credit under the provisions of § 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by priming liens, provides that the court may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(A)     the trustee is unable to obtain credit otherwise; and

15

(B)     there is adequate protection of the interest of the holder of the lien

on the property of the estate on which such senior or equal lien is proposed

to be granted.

39.     As noted above, the Debtors performed an exhaustive search for debtor-in-

possession financing.  In light of that search, and given the current credit market, the Debtors

have concluded that financing comparable to that provided by the DIP Lender is currently

unobtainable without the priming of the prepetition liens of the Prepetition Lienholders. *See In re*

*Utah 7000, L.L.C.*, Case No. 08-0991146, 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008)

(finding that debtor unable to obtain financing without priming of prepetition liens); *In re*

*Mosello,* 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.*,

136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.*, 58 B.R. 725,

736 (Bankr. S.D.N.Y. 1986) (same).  In addition, the Debtors submit that the adequate protection

to be provided to the Prepetition Lienholders as detailed below, is sufficient to approve the

priming of their liens under § 364(d) of the Bankruptcy Code.

**C.     Approval of Adequate Protection**

40.     In exchange for the Debtors' priming of the Prepetition Lienholders own

prepetition liens, the Debtors propose to provide the Prepetition Lienholders with adequate

protection in accordance with §§ 364(d) and 361 of the Bankruptcy Code.  To that end, the

Debtors request that the Court approve and authorize the Debtors' proposed adequate protection

of the Prepetition Lienholders' interest in their respective Prepetition Collateral in respect of any

diminution in value resulting from (a) the imposition of the automatic stay pursuant to § 362 of

the Bankruptcy Code, and (b) the implementation of the DIP Facility and the priming of the prepetition liens.

41.     The adequate protection proposed by the Debtors includes (a) Adequate Protection Liens constituting replacement liens (the "Replacement Liens") on the unsold Golf Club memberships which are not now subject to any liens other than any liens granted to the DIP Lender pursuant to the Interim Order and Final Order; and (b) the resultant increase in value of the Prepetition Lienholders' interests in their collateral associated with the DIP Facility effects of increasing the Debtors' liquidity and facilitating continuity of their ongoing ordinary course operations during these Chapter 11 Cases and maintenance and prevention of deterioration of the golf course.

42.     The Debtors submit that the proposed adequate protection package is more than sufficient to adequately protect the Prepetition Lienholders against the risk of any diminution in value of each of its interests in its respective Prepetition Collateral during the Chapter 11 cases.

43.     Where a debtor is seeking to prime prepetition lienholders, § 364(d) of the Bankruptcy Code must be satisfied.  Specifically, § 364(d)(1)(B) of the Bankruptcy Code provides that in order to obtain postpetition financing secured by a "priming" lien, the Debtors must establish that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. 364(d)(1)(B).

44.     Section 361 of the Bankruptcy Code, which identifies a non-exhaustive list of forms of adequate protection, states:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
>> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title *results in a decrease in the value of such entity's interest in such property*;
>>
>> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant *results in a decrease in the value of such entity's interest in such property*; or
>>
>> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent *of such entity's interest in such property.*

11 U.S.C. § 361 (emphasis added).  Although adequate protection can be provided in a number of ways, a secured creditor is entitled to protection against diminution in value of its interest in its collateral during the period of use and on account of the granting of the priming lien.  See *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (purpose of adequate protection is "to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization"); *see also Swedeland*, 16 F.3d at 564 ("Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value' caused by the superpriority given to the post-petition loan.") (quoting *In re American Mariner Inds., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

45.     Each of the Prepetition Lienholders is entitled to protection against diminution in the value of its interest during the Chapter 11 cases under §§ 362 363 and/or 364 of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that each of the

18

Prepetition Lienholders is adequately protected and the proposed relief is therefore necessary and reasonable.

### (i) The Replacement Liens Adequately Protect the Prepetition Lienholders' Interest in their Collateral

46.     Section 361 of the Bankruptcy Code identifies a non-exhaustive list of different forms of protection that constitute adequate protection.  Subsection 361(2) expressly recognizes replacement liens as a form of adequate protection.  As such, the Replacement Liens contemplated by the DIP Facility will afford the Prepetition Lienholders adequate protection to the extent that the § 362 automatic stay on the Prepetition Lienholder's collateral, and the granting of priming liens results in a decrease in the value of the interests in their respective collateral.  The Debtors submit that granting the Replacement Liens provides adequate protection of their interests within the meaning of §§ 361 and 364(d) of the Bankruptcy Code. *See In re Utah* 7000, L.L.C., Case No. 08-0991146, 2008 WL 2654919, *3-4 (Bankr. D. Utah July 3, 2008) (approving adequate protection of prepetition creditor's interests based, in part, on fact that debtor offered replacement liens in additional collateral not subject to prepetition liens).  In light of the foregoing, and for the reasons set forth below, the Replacement Liens will afford the Prepetition Lienholders substantial protection.

### (ii) The DIP Facility Increases the Value of the Prepetition Lienholders' Interest in Their Collateral

47.     These Chapter 11 Cases were precipitated by the Debtors' severe liquidity problems.  Without the proposed financing and cash collateral usage, the Debtors will run out of cash and be forced to immediately cease operations, likely destroying their going concern value. The value of the Prepetition Lienholders' interest in their collateral is greatly increased by the

DIP Facility because it ensures the continued operation of the Debtors' facilities and the maintenance and preservation of the golf course and the Debtors' going concern value during the pendency of these Chapter 11 Cases.

      48.     For purposes of adequate protection in the context of postpetition financing, a secured creditor's "interest" in collateral is not valued by the amount owed to the secured creditor, but rather the value of the collateral absent the postpetition superpriority financing. *See Swedeland*, 16 F.3d at 564 ("In other words, the [proposed adequate protection] should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."); *see also In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding that because the proposed DIP financing would allow the debtor to remove environmental hazards from its facility, lift the injunction, and resume operation of its business, the DIP financing would greatly increase the value of the prepetition creditor's collateral.) It follows that, in valuing any Prepetition Lienholders' interests, the Court must look not to the amount of the prepetition debt, but rather at what the Prepetition Lienholder's collateral would be worth without the DIP Facility. Here, the value of each of the Prepetition Lienholders' interests in their respective collateral is the value of such collateral absent the DIP Facility – i.e. the value of the Debtors' facilities if operations are ceased and such facilities are shut down. By allowing the Debtors to continue to operate, the Debtors submit that the DIP Facility will greatly increase the value of the collateral and will prevent any diminution of that value. Therefore, the Prepetition Lienholders are adequately protected. *See In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("[A]n increase in the value of the

collateral . . . resulting from the superpriority financing could constitute adequate protection.")
(citing *In re First South Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987))

49.     In light of the foregoing, the Debtors submit that the forms of protection proposed by the Debtors more than adequately protect the interests of the Prepetition Lienholders and, therefore, the relief sought herein should be granted.  Moreover, the Debtors have demonstrated herein and will demonstrate through testimony, that absent such relief, the Debtors will suffer immediate and irreparable harm.

### D.      Approval of Use of Cash Collateral

50.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to § 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

51.     The Debtors request that this Court authorize the Debtors to enter into the DIP Facility pursuant to the Interim Order, for the period from the Petition Date through the Final Hearing.  Such interim authorization of the DIP Facility is necessary for the Debtors to meet payroll and continue uninterrupted operations pending a final hearing.  Absent the granting of interim relief, the Debtors will not be able to meet their working capital needs, substantial enterprise value will be at risk of loss and the Debtors' facilities cannot remain operational. Discontinuation of the Debtors' operations would result in substantial loss of value for the Debtors' estates and their stakeholders.

**E.      Notice With Respect To Emergency Hearing on DIP Facility**

52.      Notice of this Motion has been given by facsimile and/or email to the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee; (ii) the Prepetition Lienholders and their counsel; and (iii) Gallatin County; (iv) Wells Fargo Leasing and its counsel, (v) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these cases.  The Debtors submit that under the circumstances, no further notice of the hearing on the interim financing set forth in the Interim Order is necessary and request that any further notice be dispensed with and waived.

**F.      Interim Hearing and Final Hearing**

53.      The Debtors respectfully request that the Court (a) schedule the Final Hearing not earlier than 15 days of the date of this Motion, and (b) authorize the Debtors to serve any interim order which fixes the time and date for filing objections to this Motion, and the Final Order, by email, facsimile or first class mail upon the following parties, or in lieu thereof, to their counsel: (i) the United States Trustee; (ii) the Prepetition Lienholders and their counsel; (iii)  Gallatin County; (iv) Wells Fargo Leasing and its counsel, (v) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these cases; and (v) all other parties ordered by the Court.  The Debtors request that the Court deem such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

## NO PRIOR REQUEST

54.      No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Interim Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper and a Final Order authorizing the Debtors to enter into the DIP Facility.

DATED this 9th day of April, 2010.

/s/ Ross P. Richardson
Ross P. Richardson
**HENNINGSEN, VUCUROVICH &**
**RICHARDSON, PC**
116 W. Granite
Butte, MT 59701
Attorney for Black Bull Golf, Inc.

/s/ James A. Patten
James A. Patten
**PATTEN, PETERMAN, BEKKEDAHL**
**& GREEN, PLLC**
2817 2nd Avenue North Suite 300
Billings, MT 59101
Attorneys for Black Bull Run Development
LLC

**CIP BB LENDING LLC**
c/o CrossHarbor Capital Partners
One Boston Place
Boston, Massachusetts 02108

April 9, 2010

Black Bull Run Development LLC
P.O. Box 10969
Bozeman, MT 59771-0969

Black Bull Golf Course, Inc.
P.O. Box 10969
Bozeman, MT 59771-0969

Re:     Debtor-In-Possession Loan

Gentlemen

Pursuant to our discussions the following is an outline of some of the general terms under which we, on our own behalf or through an affiliate, (the "DIP Lender") would consider providing debtor-in-possession financing (the "DIP Loan") to Black Bull Run Development LLC (the "Development Debtor") as the debtor and debtor in possession in the Chapter 11 Bankruptcy Proceeding pending as Case No. 10-60593 (the "Development Case") in the United States Bankruptcy Court for the District of Montana (the "Bankruptcy Court") and to Black Bull Golf Course, Inc. (the "Golf Course Debtor") as the debtor and debtor in possession in the Chapter 11 Bankruptcy Proceeding pending as Case No. 10-60537 (the "Golf Course Case") in the Bankruptcy Court. It should be understood that these basic terms are only cursorily outlined and are only some of the more important points that would need to be agreed upon and documented in definitive loan documentation approved by the Bankruptcy Court (the "DIP Loan Documentation")[1].

**This summary of terms and the contents hereof are CONFIDENTIAL and shall not be distributed or disseminated by any party referenced herein other than with the prior written consent of CIP BB LENDING LLC**

| | |
|---|---|
| **Borrower:** | Collectively, the Development Debtor and the Golf Course Debtor, each of which shall be jointly and severally liable for the obligations under the DIP Loan. |
| **DIP Loan Amount:** | Up to $2,600,000. |
| **Availability** | Up to $340,000 (or such lesser amount as is approved by the Bankruptcy Court) (the "Interim Advance") will be available to be drawn down upon an order of the Bankruptcy Court approving the DIP Loan on an interim basis, containing terms and conditions satisfactory to the DIP Lender in its sole discretion (the "Interim Order"). |

---

[1] In addition to the points addressed herein, the DIP Loan Documentation would contain usual and customary terms and provisions for financings of this type.

1

| | |
|---|---|
| | The DIP Lender will fund the Dip Loan on the Closing Date into a collateral account pledged to the DIP Lender and will be disbursed from the collateral account in accordance with the Approved Budget (defined below) and the DIP Loan Documentation.  The DIP Lender, upon notice to Borrower, shall have the right to charge against and withdraw from the collateral account all interest, fees and expenses provided for in this Term Sheet and the Loan Documentation, including without limitation, the Commitment Fee and the fees and disbursements of the DIP Lender's legal counsel to the extent approved by the Bankruptcy Court. |
| **Interest Rate:** | Fifteen percent (15%), payable monthly, in cash, in arrears, calculated on an actual/360 day basis.  The DIP Loan Amount will include a fully funded interest reserve which reserve will be drawn upon to fund interest due and payable on the DIP Loan.

During the continuance of any event of default, interest will accrue at the applicable interest rate plus 5.0% per annum. |
| **Commitment Fee:** | $26,000 representing one percent (1%) of the DIP Loan Amount. |
| **Maturity:** | The earliest to occur of (a) nine months from the Closing Date, (b) the confirmation of any plan of reorganization or Section 363 sale pursuant to an order entered by the Bankruptcy Court in either the Development Case or the Golf Course Case, and (c) the acceleration of the DIP Loan in accordance with the terms of the DIP Loan Documentation.  In connection with any plan of reorganization, 363 sale or other transfer of the Development Debtor's or Golf Course Debtor's assets, the DIP Loan must be repaid as a condition thereof and the successful purchaser, bidder or otherwise shall not be permitted to take title to the relevant assets subject to the DIP Loan.

The DIP Loan shall not be subject to amortization. |
| **Use of Proceeds:** | The proceeds of the DIP Loan will be used solely to pay: (i) the post-petition operating expenses of the Borrower as set forth in the Approved Budget; (ii) interest on the DIP Loan; (iii) other costs and expenses of administration of the Development Case and Golf Course Case as required pursuant to, and used solely in accordance with, the Approved Budget; and (iv) fees, costs and expenses of the DIP Lender. |
| **Closing Date:** | As soon as practicable following the entry of a final order of the Bankruptcy Court approving the DIP Loan, containing terms and conditions satisfactory to the DIP Lender in its sole discretion (the "Final Order"). |
| **Priority and Security:** | The DIP Loan is to be secured by fully perfected liens and security interests on all of Borrower's assets now or hereafter acquired, whether held directly or indirectly including interests in other entities and by super priority administrative claims customary in transactions of this type, including, without limitation, fully perfected liens and security interests on all real property owned by the Borrower, all accounts receivable of the Borrower, all rents and revenues from the operation of the Black Bull Golf Course, all revenues from lot sales, all unsold memberships in the Black Bull Golf Course and all proceeds of the foregoing (collectively, the "Collateral"), which liens shall be first priority, priming and senior security interest and liens in and on all the Collateral, provided that that the liens and super priority position securing the DIP Loan shall be subject to a carve out in customary form with respect to the allowed post-petition fees and expenses |

2

| | |
|---|---|
| | of Borrower's counsel and other professionals retained by the Borrower set forth in the Approved Budget (the "Carve-Out"), which Carve-Out shall in no event exceed $365,000 in the aggregate and the liens shall also be subject to the liens of Gallatin County for taxes and liens on the golf course equipment shall be subject to the liens of Wells Fargo Leasing. |
| **Adequate Protection** | Except as provided in the proposed DIP Budget, unless otherwise agreed by the DIP Lender, the DIP Loan Proceeds shall not be used to pay adequate protection to existing lenders. |
| **Mandatory Prepayments:** | The DIP Loan shall be prepaid with (a) 100% of the net cash proceeds of all asset sales or other dispositions of property by the Borrower (including proceeds from the sale of stock of any subsidiary of Borrower); (b) 100% of the net cash proceeds of certain extraordinary receipts (including tax refunds, indemnity payments, pension reversions, and insurance and condemnation proceeds no included as proceeds of asset dispositions); and (c) other amounts which are usual and customary for debtor-in-possession financings. |
| **Restructuring Benchmarks:** | The Borrower shall be required to satisfy the following benchmarks (the "Benchmarks") by the date listed:<br><br>(a)      On or before the last day of each calendar month, Borrower shall collect monthly dues for such month from at least 80% of the golf club members and 80% of the social members in accordance with the Approved Budget from those members required to pay dues, which aggregate amount collected from golf club members and social members shall be no less than $31,044.00 per month. Membership dues shall be used and applied to pay expenses in accordance with the Approved Budget.<br><br>(b)      On or before August 1, 2010, Borrower shall file proposed Chapter 11 plans of reorganization and disclosure statements thereto in each of the Development Case and the Golf Course Case all in form and substance acceptable to the DIP Lender (the "Plan Documents").<br><br>(c)      On or before November 15, 2010, the Bankruptcy Court shall have confirmed the reorganization plans in each of the Development Case and the Golf Course Case contemplated by the Plan Documents and that are acceptable to the DIP Lender.<br><br>(d)      If the Borrower is unable to propose and secure confirmation of plans of reorganization on or before November 15, 2010, Borrower shall be required to commence a sale, pursuant to Section 363 of the Bankruptcy Code, of substantially all of the Borrower's assets, which sale shall be consummated on or before December 31, 2010.  Any sale of any assets of Borrower at any time during the Golf Course Case or Development Case shall be conducted only on terms and with procedures that are agreeable to the DIP Lender, and the commencement by motion or otherwise of any such sale on terms and with procedures that are not approved in advance by the DIP Lender shall be an immediate Event of Default. |

3

|  | Failure to satisfy a Benchmark shall be an Event of Default. |
|---|---|
| **Conditions Precedent to the DIP Loan:** | • Entry of the Interim Order for draws up to $340,000.00 and the Final Order for subsequent draws.<br><br>• The Borrower and DIP Lender shall have agreed upon a budget (the "Approved Budget") in a form satisfactory to the DIP Lender in its sole discretion.<br><br>• All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Loan (including, without limitation, the Interim Order and the Final Order) shall be in form and substance satisfactory to the DIP Lender in its sole discretion.<br><br>• There shall have occurred no material adverse effect on any of the assets, properties, or operations (financial or otherwise) of the Borrower since March 22, 2010.<br><br>• DIP Lender's review and approval of the following items relating to the Borrower and its assets:<br><br>   1. Environmental status of the real property owned by the Borrower;<br>   2. Title and survey review of the real property owned by the Borrower;<br>   3. Governmental entitlements and permits relating to the assets and operations of the Borrower; and<br>   4. Contracts, including membership agreements, between the Borrower and third parties. |
| **Conditions Precedent to Draws from the Escrow Account** | Draws from the collateral account will be conditioned upon the following:<br><br>The Borrower shall have operated (including as to revenues, expenditures and accruals) in accordance with the Approved Budget since the commencement of the Golf Course Case within reasonable, customary and appropriate variances to be included in the final Loan Documentation.<br><br>• There shall exist no Default or Event of Default.<br><br>• The representations and warranties of the Borrower in the DIP Loan Documentation shall be true and correct immediately prior to, and after giving effect to, funding, except to the extent that any such representation or warranty expressly relates only to an earlier date<br><br>• No Material Adverse Change. |
| **Participation** | To the extent the DIP Lender determines in its discretion that participation can be accomplished without undue expense or burden on DIP Lender's administration of the DIP Loan, the DIP Lender will consider making up to $250,000 of the DIP Loan available to participation by current members of the Black Bull Golf Course in minimum participation amounts and terms and conditions to be determined by DIP Lender. |
| **Governing Law** | Commonwealth of Massachusetts |

Nothing contained herein shall be considered or intended as legally binding on us or you.  Proceeding with a DIP Loan is subject to loan documentation in a form acceptable to us and to you and approval by the Bankruptcy Court.

Sincerely,

CIP BB LENDING LLC

By: _____
Name:
Title:  Authorized Signatory

5

| Total | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL BUDGET RECAP BY DEPARTMENT 2010 | | | | | | | | | | | | |
| (151,400) | (13,000) | (13,000) | (13,000) | (13,200) | (13,000) | (12,000) | (12,000) | (12,000) | (12,000) | (12,200) | (13,000) | (13,000) |
| (1,413,833) | (59,437) | (60,352) | (59,687) | (144,576) | (297,418) | (117,156) | (125,765) | (122,910) | (176,496) | (118,646) | (70,617) | (60,772) |
| (220,385) | (10,965) | 2,965 | 465 | 1,715 | (95,185) | (12,215) | (4,435) | (13,035) | (2,685) | (1,235) | (79,135) | (6,642) |
| (41,848) | (4,131) | (4,131) | (4,074) | (4,342) | (5,700) | (5,003) | (1,628) | (1,528) | (5,038) | (4,177) | (3,186) | 1,093 |
| (89,572) | (8,052) | (8,102) | (7,241) | (6,772) | (7,357) | (6,707) | (8,657) | (8,657) | (6,369) | (6,291) | (6,952) | (8,414) |
| (76,485) | (6,878) | (6,978) | (7,978) | (7,478) | (6,078) | (4,628) | (4,728) | (4,778) | (4,428) | (4,378) | (6,878) | (11,278) |
| (17,028) | (7,429) | (13,479) | (4,663) | 2,894 | (14,231) | 3,021 | 7,852 | 8,855 | 11,186 | 1,012 | (4,354) | (7,689) |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (23,300) | 0 | 0 | 0 | (2,850) | (19,600) | (200) | (250) | (200) | (100) | (100) | 0 | 0 |
| (19,900) | | (4,400) | | (5,500) | (2,500) | (7,500) | | | | | | |
| (365,000) | | | | (30,000) | (120,000) | (20,000) | (70,000) | (30,000) | (50,000) | (15,000) | (15,000) | (15,000) |
| (2,418,750) | (109,892) | (107,477) | (96,179) | (210,110) | (581,070) | (182,389) | (219,612) | (184,254) | (245,930) | (161,015) | (199,121) | (121,702) |